## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| MARIA DIAZ, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>v.<br><br>A-LINE STAFFING SOLUTIONS LLC,<br><br>    Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Maria Diaz ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant A-Line Staffing Solutions LLC ("Defendant" or "A-Line"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for the Class and Subclass, as defined below, from A-Line. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I.   <u>Introduction</u>

1.     This class action arises out of the recent targeted cyberattack and data breach on A-Line's network that resulted in unauthorized access to highly sensitive information pertaining to job applicants and employees of Defendant. Plaintiff brings this class action against A-Line for its failure to secure and safeguard their and Class members' personally identifiable information ("PII" or "Private Information"). As a result, Plaintiff and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the imminent risk of future harm caused by the compromise of their sensitive personal information.

2.     A-Line provides recruiting solutions for a variety of industries, with a focus on the medical and IT industries.

3.     As a condition of receiving employment, A-Line's clients are required to provide and entrust A-Line with sensitive and private information, including PII.

4.     A-Line discovered that its systems were subject to a cybersecurity attack on or around June 3, 2024, which resulted in unauthorized access to Private Information (the "Data Breach"). [1]

---

[1] The Data Breach was publicly disclosed on the Attorney General of Texas' website on 7/22/24 ("Data Security Breach Reports"), available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed August 1, 2024).

5.      On July 19, 2024, A-Line reported the Data Breach with the California Attorney General. On July 22, 2024, Defendant did the same with the Attorney General of Texas. It began sending out notification letters to affected parties around July 19, 2024.

6.      A-Line's notice letter provided scant detail, particularly considering the size and scope of the Data Breach and the sensitivity of Plaintiff's and Class Members' compromised information.

7.      A-Line's notice did not disclose how it discovered the cybersecurity attack, how the attack was detected and terminated, the means and mechanisms of the cybersecurity attack, the reason for its delay in notifying Plaintiff and the Class of the Data Breach after learning that Private Information was impacted, how A-Line determined that PII was "impacted," and, importantly, what steps A-Line took following the Data Breach to secure its systems and prevent future cyberattacks.

8.      A-Line reported that the scope of information involved includes individuals' full names, dates of birth, social security numbers, driver's license number or state ID, and/or employment information.

9.      The Data Breach was a direct result of A-Line's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect clients' PII and PHI from the foreseeable thread of a cyberattack.

10.     By taking possession and control of Plaintiff's and Class Members' Private Information for its own pecuniary benefit, A-Line assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Private Information against unauthorized access and disclosure. A-Line also had a duty to adequately safeguard this Private Information under industry standards and duties imposed by statutes, Section 5 of the Federal Trade Commission Act ("FTC Act"). A-Line breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect clients' Private Information from unauthorized access and disclosure.

11.     The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. As a result of the Data Breach, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, unauthorized access to email accounts, tax fraud, and identity theft.

12.     Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit,

4

financial accounts, health records, and email accounts, and take several additional prophylactic measures.

13.     There has been no assurance offered by A-Line that all impacted Private Information or copies thereof have been recovered or destroyed.

14.     As a result of A-Line's inadequate security and breach of its duties and obligations, the Data Breach occurred, causing Plaintiff and Class Members to suffer injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive personal information. Plaintiff's and Class Members' sensitive personal information—which was entrusted to A-Line, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

15.     The injury to Plaintiff and Class Members was compounded by the fact that A-Line did not notify clients that their Private Information was subject to unauthorized access and exfiltration until late in July of 2024. A-Line's failure to timely notify the victims of its Data Breach meant that Plaintiff and Class Members were unable to take affirmative measures to prevent or mitigate the resulting harm.

5

16.     Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiff's and Class Members' sensitive and confidential Private Information still remains in the possession of A-Line. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

17.     A-Line disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard client PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and Class Members prompt and adequate notice of the Data Breach.

18.     In addition, A-Line and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had A-Line properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

19.     The security of Plaintiff's and Class Members' identities is now at risk because of A-Line's wrongful conduct as the Private Information that A-Line

collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

20.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to actual fraud and identity theft as well as a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against further fraud and identity theft.

25.     Plaintiff and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

21.     Plaintiff and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. Due to the fact that the exposed information potentially includes Social Security numbers ("SSNs") and other immutable personal details, Plaintiff and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

22.     Plaintiff brings this action on behalf of herself and individuals in the United States, as well as Subclass Members (defined below), whose Private Information was exposed as a result of the Data Breach discovered by Defendant on or around June 3, 2024, and which A-Line only first publicly acknowledged on or

about July 19, 2024. Plaintiff and Class Members seek to hold A-Line responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of themselves and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach.

23.    Plaintiff thus seek remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including improvements to A-Line's data security systems, future annual audits, and adequate credit monitoring services funded by A-Line.

## II.    THE PARTIES

**Plaintiff**

26.    Plaintiff Maria Diaz is a resident and citizen of the State of Massachusetts. Plaintiff provided her PII to Defendant in the regular course of contracting for employment as a nurse with a third-party (CVS Pharmacy) through A-Line.

**Defendant**

27.    Defendant is a Michigan limited liability company with a principal place of business located at 7529 Auburn Rd. Utica, MI 48317.

## III.    JURISDICTION AND VENUE

28.    This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from A-Line.

29.    This Court has personal jurisdiction over the A-Line named in this action because A-Line is headquartered in this District and A-Line conducts substantial business in Michigan and this District through its headquarters, offices, parents, and affiliates.

30.    Venue is proper in this District under 28 U.S.C. §1391(b) because A-Line and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

*A.    A-Line Staffing Solutions' Business*

31.    Since 2004, A-Line has provided recruitment services, with a focus on the medical and IT industries.[2]

32.    As a condition of providing employment contracting to individuals seeking jobs, A-Line requires that its clients entrust it with Private Information. On

---

[2] *About Us*, https://www.alinestaffing.com/healthcare-it-hr-recruitment/ (last accessed August 1, 2024).

information and belief, in the ordinary course of A-Line's recruitment activities, A-Line maintains the Private Information of clients, including but not limited to:

- Name, address, phone number and email address;

- Date of birth;

- Demographic information;

- Social Security number;

- Financial information;

- Photo identification;

- Employment information, and;

- Other information that A-Line may deem necessary for recruiting activities.

33.     Because of the highly sensitive and personal nature of the information A-Line acquires and stores with respect to clients, A-Line, upon information and belief, promises to, among other things: keep customers' PII private; comply with industry standards related to data security and Private Information; inform customers and clients of legal duties and comply with all federal and state laws protecting customers' and clients' Private Information; only use and release customers' Private Information for reasons that relate to employment and staffing; and provide adequate notice to customers if their Private Information is disclosed without authorization.

34. However, A-Line did not maintain adequate security to protect its systems from infiltration by cybercriminals, and it waited nearly six months to disclose the Data Breach publicly.

35. Plaintiff and Class Members are, or were, clients of A-Line and entrusted A-Line with their Private Information.

**B.      *The Data Breach and Notice Letter***

36. According to the notice A-Line provided to Plaintiff and Class Members, A-Line discovered a cybersecurity attack had occurred to its systems on June 3, 2024. A-Line discovered that.[3] In response, A-Line stated that it is "committed to continuing to strengthen our systems' security to prevent a similar event from occurring in the future. A-Line notified law enforcement regarding this incident."[4]

37. A-Line did not publicly announce the breach until about a month later. On or about July 19, 2024, A-Line finally acknowledged the data security incident to the California Attorney General. On the same day, A-Line began notifying the impacted individuals, including Plaintiff and members of the proposed Class.[5]

38. Due to A-Line's inadequate security measures and its delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and ongoing

---

[3] Notice Letter attached as Exhibit 1.
[4] *Id.*
[5] *Id.*

risk of fraud and identity theft that they will have to deal with for the rest of their lives.

39.     Upon information and belief, and based on the type of cyberattack, along with public news reports, it is plausible and likely that Plaintiff's Private Information was stolen in the Data Breach.

40.     A-Line had obligations created by contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

41.     Plaintiff and Class Members provided their Private Information to A-Line with the reasonable expectation and mutual understanding that A-Line would comply with its obligations to keep such information confidential and secure from unauthorized access.

42.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, A-Line assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

43.     A-Line's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the across industries preceding the date of the breach.

44.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their personal information. Plaintiff and Class Members would not have allowed A-Line or anyone in A-Line's position to receive their Private Information had they known that A-Line would fail to implement industry standard protections for that sensitive information.

45.     As a result of A-Line's negligent and wrongful conduct, Plaintiff's and Class Members' highly confidential and sensitive Private Information was left exposed to cybercriminals.

## C.     A-Line Failed to Comply with FTC Guidelines

46.     A-Line was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

47.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

13

48.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[6] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[7]

49.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[6] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 19, 2022).
[7] *Id*.

50.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

51.     A-Line failed to properly implement basic data security practices.

52.     A-Line's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53.     A-Line was at all times fully aware of the obligation to protect the Private Information of customers and clients. A-Line was also aware of the significant repercussions that would result from its failure to do so.

**D.     *A-Line Failed to Comply with Industry Standards***

54.     Experts studying cyber security routinely identify recruiting services as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

55.     Several best practices have been identified that at a minimum should be implemented by staffing companies like A-Line, including but not limited to

educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

56.     Other best cybersecurity practices that are standard across industries include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

57.     A-Line failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

58.     These foregoing frameworks are existing and applicable standards across the industry, and A-Line failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

E.    *A-Line Breached its Duty to Safeguard Plaintiff's and Class Members'*
      *Private Information*

59.    In addition to its obligations under federal and state laws, A-Line owed
a duty to Plaintiff and Class Members to exercise reasonable care in obtaining,
retaining, securing, safeguarding, deleting, and protecting the Private Information in
its possession from being compromised, lost, stolen, accessed, and misused by
unauthorized persons. A-Line owed a duty to Plaintiff and Class Members to provide
reasonable security, including consistency with industry standards and requirements,
and to ensure that its computer systems, networks, and protocols adequately
protected the Private Information of Class Members.

60.    A-Line owed a duty to Plaintiff and Class Members to create and
implement reasonable data security practices and procedures to protect the Private
Information in its possession, including adequately training its employees and others
who accessed Private Information within its computer systems on how to adequately
protect Private Information.

61.    A-Line owed a duty to Plaintiff and Class Members to implement
processes that would detect a compromise of Private Information in a timely manner.

62.    A-Line owed a duty to Plaintiff and Class Members to act upon data
security warnings and alerts in a timely fashion.

63.    A-Line owed a duty to Plaintiff and Class Members to disclose in a
timely and accurate manner when and how the Data Breach occurred.

64. A-Line owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

65. A-Line owes a legal duty to secure consumers' PII and PHI and to timely notify consumers of a data breach.

66. A-Line breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. A-Line's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b. Failing to adequately protect customers' Private Information;

    c. Failing to properly monitor its own data security systems for existing intrusions;

    d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

    e. Failing to detect unauthorized ingress into its systems;

    f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

    g. Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

    h. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

    i. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

    j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

k.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

l.      Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

m.     Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

n.      Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

o.      Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

p.      Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

q.      Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

r.      Failing to adhere to industry standards for cybersecurity as discussed above; and

s.      Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

67.     A-Line negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

68.    Had A-Line remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, A-Line could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

69.    However, due to A-Line's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with A-Line.

**F.    *A-Line Knew or Should Have Known that Criminals Target Private Information***

70.    At all relevant times, A-Line knew, or should have known, its clients', Plaintiffs', and all other Class Members' Private Information was a target for malicious actors. Despite such knowledge, A-Line failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that A-Line should have anticipated and guarded against.

71.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of clients and/or like Plaintiff and Class Members.

72.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs,

Private Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

73.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."  This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[8]

74.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more

---

[8] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed November 29, 2022).

salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[9]

75. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

## G. *Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft*

71. Cyberattacks and data breaches at companies like A-Line are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

72. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[10]

73. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal

---

[9] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/ stable/23015560?seq=1.
[10] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf.

personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

74.    Theft of Private Information is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.

75.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended

fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

76. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

77. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

---

[11] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Jan. 19, 2022).

78.     Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[12]

79.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.  For example, with the Private Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

80.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

81.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market,

---

[12] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

82.    For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

83.    Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

84.    Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number:** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change

---

[13] *Data Breaches Are Frequent*, *supra* note 11.

your Social Security number and it's not a good idea because it is connected to your lift in so many ways. [14]

85.     For instance, with a stolen Social Security number, which is only one subset of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[15]

86.     The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[16] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[17] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[14] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (emphasis added).

[15] *Id.*

[16] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (Jan. 19, 2022).

[17] *Id* at 4.

87.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

88.    This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like A-Line is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

89.    Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[19] "[I]f there is reason to believe that your

---

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[19] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

personal information has been stolen, you should assume that it can end up for sale on the dark web."[20]

90. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it.*[21]

91. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[22]

92. Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

93. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer

---

[20] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[21] *Id.*
[22] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Aug. 2, 2022).

systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[23]

94.     There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

95.     For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[24]

96.     Cybercriminals can post stolen Private Information on the cyber black-market for years following a data breach, thereby making such information publicly available.

---

[23] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[24] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

97.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[25]

98.     It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

99.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information.

---

[25] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013),     http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.



100.   Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[26]

101.   As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their Private Information exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiff and Class Members must now take the

---

[26] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013),   http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

102. Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b. Trespass, damage to, and theft of their personal property, including Private Information;

c. Improper disclosure of their Private Information;

d. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

e. The imminent and certainly impending risk of having their confidential information used against them by spam callers to defraud them;

f. Damages flowing from A-Line's untimely (and in some cases, non-existent) and inadequate notification of the Data Breach;

g. Loss of privacy suffered as a result of the Data Breach;

h. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i. Ascertainable losses in the form of deprivation of the value of clients' personal information for which there is a well-established and quantifiable national and international market;

j. The loss of use of and access to their credit, accounts, and/or funds;

k. Damage to their credit due to fraudulent use of their Private Information; and

l. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

103. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of A-Line, is protected from further public disclosure by the implementation of better employee training and

industry standard and statutorily compliant security measures and safeguards. A-Line has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' Private Information.

104.   Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to A-Line is removed from A-Line's unencrypted files.

105.   A-Line itself acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members the inadequate 12 months of identity theft protection and credit monitoring services. This limited identity theft monitoring is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.

106.   A-Line further acknowledged, in its letter to Plaintiff and Class Members, that, in response to the Data Breach, A-Line has "implemented a series of cybersecurity enhancements, including installation of additional endpoint detection and response software, resetting all passwords and rebuilding affected servers."[27]

107.   The notice further acknowledged that the Data Breach would cause inconvenience to affected individuals by providing numerous "steps" for Class Members to take in an attempt to mitigate the harm caused by the Data Breach,[28]

---

[27] https://www.firsttoserve.com/notice/.
[28] *Id.*

and that financial harm would likely occur, stating: "Out of an abundance of caution, and in accordance with applicable law, we are providing this notice to you so that you can take steps to minimize the risk that your information will be misused. The attached sheet describes steps you can take to protect your identity, credit, and personal information."

108.    At A-Line's suggestion, Plaintiff are trying to mitigate the damage that A-Line has caused them. Given the kind of Private Information A-Line made accessible to hackers, however, Plaintiff are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[29] None of this should have happened.

**H.**    *The Data Breach Was Foreseeable and Preventable*

109.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can

---

[29] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

tell you the names of some of the biggest cybersecurity breaches: Target,[30] Yahoo,[31] Marriott International,[32] Chipotle, Chili's, Arby's,[33] and others.[34]

110.    A-Line should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

111.    A-Line was clearly aware of the risks it was taking and the harm that could result from inadequate data security, and it could have prevented this Data Breach.

112.    Data disclosures and data breaches are preventable.[35] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and

---

[30] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[31] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[32] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[33] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[34] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[35] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

the correct design and implementation of appropriate security solutions."[36] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[37]

113.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[38]

114.    In a Data Breach like this, many failures laid the groundwork for the Breach.  The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[39]  The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal

---

[36] *Id.* at 17.
[37] *Id.* at 28.
[38] *Id.*
[39] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

115.    Upon information and belief, A-Line failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, A-Line also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

116.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[40]

---

[40] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

117.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, A-Line could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[41]

118.    The threat continues. In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security. The CFPB noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data

---

[41] *Id.* at 3-4.

can violate the prohibition on "unfair acts or practices" in the Consumer Finance

Protection Act (CFPA).

119.    Further, to prevent and detect ransomware attacks, A-Line could and

should have implemented, as recommended by the United States Cybersecurity &

Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.   Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[42]

120.    In addition, to prevent and detect ransomware attacks, A-Line could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[42] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- **Build credential hygiene**

    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[43]

121.    Given that A-Line was storing the Private Information of more than 800,000 individuals, A-Line could and should have implemented all of the above measures to prevent and detect ransomware attacks. These are basic, common-sense email security measures that every business should be doing. A-Line, with its heightened standard of care should be doing even more.

122.    Specifically, among other failures, A-Line had far too much confidential unencrypted information held on its systems.  Such Private Information

---

[43] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

should have been segregated into an encrypted system.[44]  Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[45]

123.    Charged with handling sensitive Private Information Defendant knew, or should have known, the importance of safeguarding its clients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its clients after a breach.  A-Line failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

124.    With respect to training, Defendant specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

---

[44] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.
[45]"Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

125.    The Private Information was also maintained on A-Line's computer system in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems through ransomware attacks. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to A-Line, and thus A-Line was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left it in a vulnerable position.

126.    In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information.

127.    Plaintiff and Class Members entrusted their Private Information to A-Line as a condition of receiving recruiting related services. Plaintiff and Class Members understood and expected that A-Line or anyone in A-Line's position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that A-Line was no longer required to maintain, and timely and accurately notify them if their Private Information was compromised.

## I.  The Monetary Value of Privacy Protections and Private Information

128.   The fact that Plaintiff's and Class Members' Private Information was stolen means that Class Members' information is likely for sale by cybercriminals and will be misused in additional instances in the future. Indeed, there is already evidence that Plaintiff's Private Information is on the dark web.

129.   At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

130.   As discussed above, Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[46]

131.   At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.   Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[47]

---

[46] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed November 30, 2022). Attached hereto at Exhibit 13.
[47] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 14.

132.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[48]

133.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.  The larger the data set, the greater potential for analysis—and profit.[49]

134.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[50]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private

---

[48] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), https://allthingsd.com/20110228/webs-hot-new-commodity-privacy/ [hereinafter *Web's New Hot Commodity*] (last accessed November 30, 2022). Attached hereto at Exhibit 15.
[49] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 16.
[50] *Web's Hot New Commodity*, *supra* note 17.

Information. This business has created a new market for the sale and purchase of this valuable data.

135.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[51]

136.    As discussed above, the value of Plaintiff's and Class Members' Private Information on the black market is substantial.

137.    The ramifications of A-Line's failure to keep its clients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

138.    Victims may not realize their identity has been compromised until long after it has happened.[52] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim

---

[51] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*] (last accessed November 30, 2022). Attached hereto at Exhibit 17.
[52] *See, e.g.*, *Survey on Medical Identity Theft*, Ponemon Institute, June 2012, https://www.ponemon.org/local/upload/file/Third_Annual_Survey_on_Medical_Id entity_Theft_FINAL.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 20.

of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[53]

139.   At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

140.   Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of its clients' Private Information.

141.   Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[54] For example, different PII and PHI elements from various sources

---

[53] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 21.

[54] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last accessed November 30, 2022). Attached hereto at Exhibit 22.

may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[55] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

142.   In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

143.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

144.   In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a

---

[55] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

variety of unlawful manners, including opening new credit and financial accounts in users' names.

### J. The Data Breach's Impact on Plaintiff and Class Members

145. A-Line received Plaintiff's PII in connection with providing certain devices to them. In requesting and maintaining Plaintiff's PII for business purposes, A-Line expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII. A-Line, however, did not take proper care of Plaintiff's PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of A-Line inadequate data security measures.

146. On or around November 18, 2022, A-Line sent Plaintiff notice concerning the Data Breach. The letter stated that A-Line experienced a cybersecurity attack and that the incident may have resulted in unauthorized access to Plaintiff's PII stored on A-Line's systems. The notice stated that the compromised information that was present on the impacted files included one or more of the following data elements: name, date of birth, social security number, and employment related records. The notice further encouraged Plaintiff "to remain vigilant and consider taking steps to avoid identity theft, obtain additional information, and protect your personal information." A-Line also offered identity theft protection services through IDX, but only for a period of one year.

147.    A-Line's conduct, which allowed the Data Breach to occur, caused Plaintiff significant injuries and harm, including but not limited to, the following— Plaintiff immediately devoted (and must continue to devote) time, energy, and money to: closely monitoring their bills, records, and credit and financial accounts; changing login and password information on any sensitive account even more frequently than they already do; more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect themselves; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff has taken or will be forced to take these measures in order to mitigate her potential damages as a result of the Breach.

148.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly their entire lives. Consumer victims of data breaches are more likely to become victims of identity fraud.[56]

---

[56] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed November 30, 2022).

149.   Plaintiff greatly values her privacy, especially while receiving employment related services. Plaintiff and Class Members did not receive the full benefit of their bargain when contracting with Defendant, and instead received services that were of a diminished value to those described in their agreements with their respective emplyers that had made agreements with A-Line for the benefit and protection of Plaintiff and Class Members and their respective Private Information. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they contracted for (which would have included adequate data security protection) and the services they actually received.

150.   They would not have obtained services from A-Line, or agreed to the terms which they did to, had they known that A-Line would negligently fail to adequately protect their PII. Indeed, Plaintiff worked with A-Line with the expectation that A-Line would keep their PII secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from their medical providers had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

151.    Plaintiff and Class Members have lost confidence in A-Line as a result of the Data Breach.

152.    As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff's and Class members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

153.    Plaintiff is also at a continued risk of harm because their PII remains in A-Line systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as A-Line fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

154.    As a result of the Data Breach, and in addition to the time Plaintiff have spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff have also suffered emotional distress from the public release of their PII, which they believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing their PII for the purposes of identity theft and fraud.

155.    Additionally, Plaintiff has suffered damage to and diminution in the value of their highly sensitive and confidential PII—a form of property that Plaintiff entrusted to A-Line and which was compromised as a result of the Data Breach A-Line failed to prevent. Plaintiff has also suffered a violation of her privacy rights as a result of A-Line's unauthorized disclosure of her PII.

156.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

157.    Some of the injuries and risks associated with the loss of Private Information have already manifested themselves in Plaintiff and other Class Members' lives. Each Class Member received a cryptically written notice letter from Defendant stating that their Private Information was released, and that they should remain vigilant for fraudulent activity, with no other explanation of where this Private Information could have gone, or who might have access to it.

158.   In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

159.   Plaintiff brings this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

160.   Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

### Nationwide Class

All individuals residing in the United States whose Private Information was compromised as a result of the Data Breach, including all individuals who were sent the Notice of Data Privacy Incident on or around July 19, 2024.

In addition, or in the alternative, Plaintiff proposes the following state class:

### Massachusetts Class

All citizens of Massachusetts whose Private Information was compromised as a result of the Data Breach, including all individuals in Massachusetts who were sent the Notice of Data Privacy Incident on or around July 19, 2024.

161.   Excluded from the Class are A-Line's officers, directors, and agents; any entity in which A-Line has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of A-Line. Excluded also

from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

162.   Plaintiff reserves the right to amend or modify the Class or Class definitions as this case progresses.

163.   **Numerosity, Fed. R. Civ. P. 23(a)(1):**  The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists hundreds of thousands of individuals, including at least 800,000 individuals who were or are clients of A-Line whose sensitive data was compromised in Data Breach.

164.   **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether A-Line unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.   Whether A-Line failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether A-Line's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g*., HIPAA;

d.   Whether A-Line's data security systems prior to and during the Data Breach were consistent with industry standards;

e.   Whether A-Line owed a duty to Class Members to safeguard their Private Information;

f.   Whether A-Line breached the duty to Class Members to safeguard their Private Information;

g.   Whether A-Line knew or should have known that its data security systems and monitoring processes were deficient;

h.   Whether A-Line should have discovered the Data Breach sooner;

i.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of A-Line's misconduct;

j.   Whether A-Line's conduct was negligent;

k.   Whether A-Line breached implied contracts with Plaintiff and Class Members;

l.   Whether A-Line were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.   Whether A-Line failed to provide notice of the Data Breach in a timely manner, and;

n.   Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

165.    **Typicality, Fed. R. Civ. P. 23(a)(3)**:  Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

166.    **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

167.    **Predominance, Fed. R. Civ. P. 23(b)(3)**: A-Line has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from A-Line's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

168.    **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent

or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for A-Line. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

169.    A-Line has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

170.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a. Whether A-Line failed to timely and adequately notify the public of the Data Breach;

   b. Whether A-Line owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

   c. Whether A-Line's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether A-Line's failure to institute adequate protective security measures amounted to negligence;

e.  Whether A-Line failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

171.  Finally, all members of the proposed Class are readily ascertainable. A-Line has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by A-Line.

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

172.  Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

173.  A-Line required clients, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of recruitment services.

174. By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, A-Line owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. A-Line's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

175. A-Line owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

176. Plaintiff and the Class are a well-defined, foreseeable, and probable group of clients that A-Line was aware, or should have been aware, could be injured by inadequate data security measures.

177. A-Line owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

178.  A large depository of highly valuable client information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. A-Line knew or should have known that, given its repository of a host of Private Information for hundreds of thousands of clients posed a significant risk of being targeted for a data breach. Thus, A-Line had a duty to reasonably safeguard its clients' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Private Information.

179.  A-Line's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between A-Line and clients, recognized by common law. A-Line was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

180.  In addition, A-Line has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted

and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

181.   A-Line's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because A-Line is bound by industry standards to protect confidential Private Information.

182.   A-Line breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by A-Line includes, but is not limited to, the following:

> a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
>
> b.  Failing to adequately monitor the security of their networks and systems;
>
> c.  Failing to ensure that their email system had plans in place to maintain reasonable data security safeguards;
>
> d.  Failing to have in place mitigation policies and procedures;
>
> e.  Allowing unauthorized access to Class Members' Private Information;

  f.  Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

  g.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

183. It was foreseeable that A-Line's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the employment industry.

184. A-Line's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

185. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

186. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

187. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

188.    Plaintiff and Class Members are also entitled to injunctive relief requiring A-Line to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT
### Negligence *Per Se*
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

189.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

190.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, A-Line has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

191.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, A-Line had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

192.    A-Line breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

193.    A-Line's failure to comply with applicable laws and regulations constitutes negligence per se.

194.    But for A-Line's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

195.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of A-Line's breach of its duties. A-Line knew or should have known that it was failing to meet its duties, and that A-Line's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

196.    As a direct and proximate result of A-Line's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### THIRD COUNT
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

197.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

198.    Plaintiff and the Class Members entered into implied contracts with A-Line under which A-Line agreed to safeguard and protect such information and to

timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

199.   Plaintiff and the Class were required to and delivered their Private Information to A-Line as part of the process of obtaining services provided by A-Line. Plaintiff and Class Members paid money, or money was paid on their behalf, to A-Line in exchange for services.

200.   A-Line solicited, offered, and invited Class Members to provide their Private Information as part of A-Line's regular business practices. Plaintiff and Class Members accepted A-Line's offers and provided their Private Information to A-Line.

201.   A-Line accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members or to third parties.

202.   In accepting such information and payment for services, Plaintiff and the other Class Members entered into an implied contract with A-Line whereby A-Line became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

203.   In delivering their Private Information to A-Line, Plaintiff and Class Members intended and understood that A-Line would adequately safeguard the data as part of that service.

204.    Upon information and belief, in its written policies, A-Line expressly and impliedly promised to Plaintiff and Class Members that they would only disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

205.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

206.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

207.    Plaintiff and the Class Members would not have entrusted their Private Information to A-Line in the absence of such an implied contract.

208.    Had A-Line disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their Sensitive Information to A-Line.

209.    A-Line recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

210.    Plaintiff and the other Class Members fully performed their obligations under the implied contracts with A-Line.

211.    A-Line breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

212.    As a direct and proximate result of A-Line's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

### FOURTH COUNT
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

213.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

214.    This count is pleaded in the alternative to Count 3 (breach of implied contract).

215.    Upon information and belief, A-Line funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

216.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to A-Line.

217.    Plaintiff and Class Members conferred a monetary benefit on A-Line. Specifically, they purchased goods and services from A-Line and/or its agents and in so doing provided A-Line with their Private Information. In exchange, Plaintiff and Class Members should have received from A-Line the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

218.    A-Line knew that Plaintiff and Class Members conferred a benefit which A-Line accepted. A-Line profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

219.    Plaintiff and Class Members conferred a monetary benefit on A-Line, by working with A-Line, a portion of which was to have been used for data security

measures to secure Plaintiff's and Class Members' Personal Information, and by providing A-Line with their valuable Personal Information.

220.    A-Line was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, A-Line instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of A-Line's failure to provide the requisite security.

221.    Under the principles of equity and good conscience, A-Line should not be permitted to retain the money belonging to Plaintiff and Class Members, because A-Line failed to implement appropriate data management and security measures that are mandated by industry standards.

222.    A-Line acquired monetary benefit and Personal Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

223.    If Plaintiff and Class Members knew that A-Line had not secured their Personal Information, they would not have agreed to provide their Personal Information to A-Line.

224.   Plaintiff and Class Members have no adequate remedy at law.

225.   As a direct and proximate result of A-Line's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their Personal Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in A-Line's possession and is subject to further unauthorized disclosures so long as A-Line fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

226.    As a direct and proximate result of A-Line's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

227.    A-Line should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, A-Line should be compelled to refund the amounts that Plaintiff and Class Members (or others on their behalf) overpaid for A-Line's services.

**FIFTH COUNT**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

228.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

229.    In light of the special relationship between A-Line and Plaintiff and Class Members, A-Line became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) A-Line do store.

230.    A-Line had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its clients, in particular, to keep secure their Private Information.

231.    A-Line breached its fiduciary duty to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

232.    A-Line breached its fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

233.    A-Line breached its fiduciary duty owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

234.    A-Line breached its fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

235.    As a direct and proximate result of A-Line's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended

and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in A-Line's possession and is subject to further unauthorized disclosures so long as A-Line fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of A-Line's services they received.

236.    As a direct and proximate result of A-Line's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT SIX
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)

237.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

238.    Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

239.    As a recruiting services provider Defendant has a special relationship to its clients, like Plaintiff and the Class Members.

240.    Because of that special relationship, Defendant was provided with and stored private and valuable PII belonging to Plaintiff and the Class, which it was required to maintain in confidence.

241.    Plaintiff and the Class provided Defendant with their Private Information under both the express and/or implied agreement of Defendant to limit the use and disclosure of such Private Information.

242.    Defendant had a common law duty to maintain the confidentiality of Plaintiff's and Class Members' Private Information.

243.    Defendant owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

244.    Plaintiff and Class Members have a privacy interest in their personal and employment matters, and Defendant had a duty not to disclose confidential personal and employment related information and records concerning its clients.

245.    As a result of the parties' relationship of trust, Defendant had possession and knowledge of the confidential Private Information of Plaintiff and Class Members.

246. Plaintiff's and the Class's Private Information is not generally known to the public and is confidential by nature.

247. Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

248. Defendant breached the duty of confidence it owed to Plaintiff and Class Members when Plaintiff's and Class's Private Information was disclosed to unknown criminal hackers by way of Defendant's own acts and omissions, as alleged herein.

249. Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and

practices published to its clients; (h) storing PII in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiff's and the Class Members' Private Information to a criminal third party.

250.   But for Defendant's wrongful breach of its duty of confidences owed to Plaintiff and Class Members, their privacy, confidences, and Private Information would not have been compromised.

251.   As a direct and proximate result of Defendant's breach of Plaintiff's and the Class's confidences, Plaintiff and Class Members have suffered or will suffer injuries, including: the erosion of the essential and confidential relationship between Defendant—as a employment services provider—and Plaintiff and Class Members as clients; loss of their privacy and confidentiality in their Private Information; theft of their Private Information; costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; lowered credit scores resulting from credit inquiries following fraudulent activities; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services,

freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

252.   Additionally, Defendant received payments from Plaintiff and Class Members for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's and Class Members' Private Information.

253.   Defendant breached the confidence of Plaintiff and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiff's and Class Members' expense.

254.    As a direct and proximate result of Defendant's breach of confidences, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT SEVEN

### DECLARATORY RELIEF
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Massachusetts Class)**

255.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

256.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

257.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their

Private Information. Plaintiff and the Class remain at imminent risk that additional compromises of their Private Information will occur in the future.

258.   The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

259.   Defendant still possesses the Private Information of Plaintiff and the Class.

260.   Defendant has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiff's and Class Members' Private Information.

261.   To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

262.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at A-Line. The risk of another such breach is real, immediate, and substantial.

263.   The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at A-Line, Plaintiff and Class Members will likely continue to be subjected to a heightened, substantial, imminent risk of fraud,

identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

264.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at A-Line, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other consumers whose Private Information would be further compromised.

265.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that A-Line implement and maintain reasonable security measures, including but not limited to the following:

a.  Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on A-Line's systems on a periodic basis, and ordering A-Line to promptly correct any problems or issues detected by such third-party security auditors;

b.  engaging third-party security auditors and internal personnel to run automated security monitoring;

   c. auditing, testing, and training its security personnel regarding any new or modified procedures;

   d. purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

   e. conducting regular database scans and security checks; and

   f. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

   a) For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

   b) For equitable relief enjoining A-Line from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

   c) For equitable relief compelling A-Line to utilize appropriate methods and policies with respect to consumer data collection, storage, and

safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of A-Line's wrongful conduct;

e) Ordering A-Line to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i) Pre- and post-judgment interest on any amounts awarded; and,

j) Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: August 12, 2024

Respectfully submitted,
Nicholas A. Migliaccio
Jason S. Rathod
MIGLIACCIO & RATHOD, LLP
412 H Street, NE, Suite 302
Washington, DC  20002
Phone: 202-470-520
Fax: 202-800-2730
Email:  nmigliaccio@classlawdc.com

*Attorneys for Plaintiff and the
Putative Class*